# EXHIBIT

# A

FILED

(196)   JAN 08 2024

STATE OF INDIANA )          *Kathaniel Sweeney Bell*          IN THE MARION COUNTY
                    CLERK OF THE MARION CIRCUIT COURT   SUPERIOR COURT 3

                                        SS:     CIVIL DIVISION
COUNTY OF MARION )                              CAUSE NO. 49003-2306-CT-025152

James Wertz
Plaintiff
-vs-
Siemens Medical Solutions USA, Inc.
Defendant

**1st AMENDED COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL**
Plaintiff, James Wertz, for a claim against the Defendant, Siemens Medical Solutions
USA, Inc. alleges and states as follows:

**PARTIES**
1. Plaintiff James Wertz, at all times relevant to this complaint is and was a resident of
Marion County, Indiana.

2. The Defendant, Siemens Medical Solutions USA, Inc. is a Delaware corporation
located in Malvern, Pennsylvania.  It does business as Siemens Healthineers. Siemens
AG, a Germany company located in Munich Germany, owns a significant part of the
defendant.

**JURISDICTION**
3. This Court has jurisdiction over Defendant because Defendant has transacted
business in this state by placing it's product into the local stream of commerce and has
caused tortious injury by acts or omissions in this state. This court has jurisdiction over
Defendant pursuant to Indiana trial rule 4.4.

**VENUE**
4. Venue is proper in the Marion Superior Court, because the events giving rise to this
action occurred within this court's jurisdiction in Marion County. Indiana.Trial  Rule 75.

**FACTS RELEVANT TO ALL COUNTS**
5. On June 24, 2021 I had an MRI scan at Indiana University Health Simon Cancer
Center in CC1, a Siemen's Magnetom Skyrafit  MRI 3 Tesla magnetic field intensity
scanner. This scanner is sold in the United States by Siemens Medical Solutions USA
doing business as Siemens Healthineers.

6. Defendant sold the hearing protection headphones to Indiana University Health
Simon Cancer Center that were used on me while I underwent a MRI scan in a Siemens
Magnetom Skyrafit MRI 3 Tesla magnetic field intensity scanner. I was in the class of
persons that the defendant should have foreseen as being subject to the harm caused
by the defective condition of the headphones used on me.

1

7.I was given defendant's headphones to wear during the exam for hearing protection. I was not given earplugs to wear under the headphones. Unlike all the other headphones I have seen and used before these headphones had plastic tubes going from the headphones and back into the MRI control booth. The purpose of these plastic tubes to the headphones is so the MRI technician can play music or talk to the patient during the exam with the sound conducted by the air inside the plastic tubes from the MRI technician's control room into the headphones. The scan was very loud. At the end of the exam I complained to Vanesa Campbell, the MRI technician, that it was very loud. She said they had earplugs and I could have asked for them. After the scan my ears rang.

8. On July 1, 2021 I was examined by Midwest Ear Institute by a nurse practitioner and an audiologist and found to have tinnitus (ringing of the ears) and a hearing loss. I complained about not being able to hear conversations as well as before the MRI exam. The excessive noise of the MRI exam permanently damaged my hearing resulting in a hearing threshold shift and ringing of my ears.

DECIBELS
9. A decibel is a measure of sound intensity. Because of the large difference in sound intensity from a whisper to a jet engine the scale is logarithmic. 10 decibels of sound reduction reduces the sound to 1/10 of it's original intensity. 20 decibels of sound reduction reduces sound to 1/100 of it's original  intensity. 30 decibels of sound reduction reduces sound to 1/1000 of it's original intensity.

10. The mathematical  equation to calculate decibels sound reduction as a fraction of the original sound intensity is $1/(10^{(decibels/10)})$. So for example a 14 decibel sound reduction reduces sound to $1/(10^{(14/10)})$ = 0.0398 or 1/25 of it's original intensity.

11. A 30 decibel sound reduction decreases the sound to 1/1000 of it's original intensity whereas a 14 decibel sound reduction decreases the sound to 1/25 of it's original intensity. So the sound heard at the ear is 40 times more intense when 14 decibels protection is used than when 30 decibels protection is used. Therefore, I was exposed to a sound 40 times more intense than the user's manual for a similar model ( Siemens Magnetom Skyra 3 Tesla MRI scanner) user's manual allows. This is a different scanner than the Magnetom Skyrafit but it is a 3 Tesla magnetic field intensity scanner. That users manual requires 30 decibels of hearing protection.

12. If a sound is 130 decibels in intensity and a person has 30 decibels hearing protection inside or over their ears, the sound at the eardrums is 130-30=100 decibels at the eardrums. So you subtract the decibels of hearing protection from the sound decibels to get the decibels at the eardrums.

MRI NOISE
13. The MRI machine used on me is a Siemens Magnetom Skyrafit 3 tesla magnetic field intensity scanner. A magnetic field of 3 tesla is 30,000 gauss of magnetic field strength. The earth's magnetic field is about 0.25 to 0.65 gauss so the scanner produces a very large magnetic field. The higher the magnetic field intensity of an MRI

scanner the better the quality of the images it makes and the louder it is. A 3 tesla magnetic field scanner can emit sound up to 130.7 decibels in loudness which is a hearing hazard to a patient. The FDA requires that the decibels of sound allowed for the patient with hearing protection in place is 99 decibels. This is described in the FDA document "Criteria for Significant Risk Investigations of Magnetic Resonance Diagnostic Devices" June 20, 2014.

14. To protect a patient from 130.7 decibels requires 31.7 decibels hearing protection. This is because 130.7 decibels - 31.7 decibels of protection=99 decibels at the eardrums.

15. The following text was copied from  (*Nagoya J Med Sci*. 2007 Jan;69(1-2):23).

 However, a frequent concern has revolved around the high-intensity noise produced by modern 3-Tesla (3T) MRI scanners that can reach peak sound pressure levels of 125.7 to 130.7 dB and have an average equivalent intensity of 110 to 115 dB. This high-intensity noise could easily cause hearing loss or induce tinnitus or hyperacusis (*Nagoya J Med Sci*. 2007 Jan;69(1-2):23). The intensity of noise produced by MRI scanners generally has a positive correlation with the magnetic field strength (i.e., 3T scanners are louder than 1.5T scanners).scanner create forces on the wire windings which create loud noise which can eceed (sic)130 decibels in a 3 testa (sic)magnetic field scanner.

16. The user's manual for the Siemen's Magnetom Skyra 3 Tesla magnetic field strength MRI scanner, a similarly loud scanner, warns on page 79 that patients require hearing protection with an SNR=30 db or more. SNR= single number rating. db is an abbreviation for decibel.

Pages 16 and 17 of this pleading contain pages 1 and 79 of this user's manual.

HEADPHONES
17. I was provided Siemens Medical Solutions USA headphones model 11060845 Rev 00 PA6 GF30/PVC without earplugs under them.

18. I asked, on another day after my exam, to see the headphones used on me and was shown the headphones by Donna at 3174563425. She was a technician who works in MRI at the Simon Cancer Center. I photographed them with my cell phone and wrote down the model number etc. that was on the headphones which is model 11060845 Rev 00 PA6 GF30/PVC.

19. On or about November 2021, I found the headphones that were used on me in the December 2018 ENJMMI Research journal "Alternative headphones for patient noise protection and communication in PET-MR studies of the brain" which stated they have a 14 decibel sound reduction.

20. On or about November 2021 I found the headphones used on me in a research publication and in a sales catalog. Typically headphones reduce sound by about 30

3

decibels. The defendant's headphones used on me reduce sound by 14 decibels. The difference between the defendant's headphones and other headphones are the plastic tubes that go into each ear cup of the headphones. The plastic tubes look like PVC plastic tubing that can be bought at a hardware store.

21. The MRI laboratory safety manual for the UCLA Ahmanson-Lovelace Brain Mapping center at the University of California Los Angeles states on pages 9 and 10 that the Siemens headphones have a 13 decibel sound reduction. They use a Siemen's 3 tesla Prisma MRI scanner which is different model of a 3 Tesla scanner

Ear Plugs and Headphones

Anyone in the scanner room while the scanner is in operation must be provided with and must use hearing protection in the form of earplugs and/or headphones to avoid hearing injury from 10 the acoustic noise generated by the scanner. According to the Prisma documentation, if you are using the Siemens headphones you MUST also provide the participant with earplugs for additional hearing protection. The FDA requires 30 dB or greater for hearing protection and the Siemens headphones alone only provide 13 dB. However, the Resonance Technology headphones are sufficient to use alone without earplugs.

Pages 18, 19, and 20 of this pleading contains pages 1,9, and 10 of this laboratory safety manual.

22. In the December 2018 journal EJNMMI Research "Alternative headphones for patient noise protection and communication in PET-MR studies of the brain" the Siemens headphones are stated to have a 14 decibel sound reduction.
 According to the manufacturers' specifications, the sound absorption in the standard headphone system is around 14 dB and for the earphone earplugs 30 ...

23. On December 13, 2023 I called Siemens Healthineers at 8008887436 and spoke to John and gave him the model number of the headphones. He called back at 1:36 pm and left a message on my cell phone which was transcribed as follows:
Hey Jim, how are you doing. This is John with Siemens up time. We were speaking on the phone got cut off. I found it. It's going to be 14 db's for the earphones. Alrighty. If you have any questions, give us a call back, but it's 14 db's okey-doke. Have a good one. Take Care. Bye bye.
He also told me in a verbal conversation that the headphones sell for $582.

24. On page 25 of the GIFMI MRI user manual for using the Siemens Prisma MRI scanner which is a 3 Tesla magnetic field strength MRI scanner the following caution appears:

Inside the scanner room: squeeze ball (participant's alarm) and Siemens ear phones
The scanner is equipped with a squeeze ball that allows the participant to set off an

audible alarm to attract the operator's attention. Making the squeeze ball available to participants is mandatory during the entire protocol. Show the participant how to activate the alert by pressing the squeeze bulb. The participant can use the earphones to listen to announcements or music during the measurement. The use of earphones has to be combined with the use of earplugs!

Pages 21 and 22 of this pleading contain pages 1 and 25 of this user's manual.

25. The American College of Radiology version 1 2020 has the following statement:

Auditory Considerations All patients and volunteers should be offered and encouraged to use hearing protection prior to undergoing any imaging in any MR scanners. The FDA considers MRI systems capable of producing sound pressures that exceed 99 A-weighted decibels (dB(A)) with hearing protection in place as a significant risk.

The International Electrotechnical Commission (IEC) standard on this issue (IEC 60601-2-33:2010) 66 also states that, for all equipment capable of producing more than an A-weighted root mean square (r.m.s.) sound pressure level of 99 dB(A), hearing protection shall be used for the safety of the patient, and this hearing protection shall be sufficient to reduce the A-weighted r.m.s. sound pressure level to below 99 dB(A). It is important that facilities provide instruction on proper placement of hearing protection to all persons receiving them and verify fit and function of the hearing protection prior to the MR examination. All patients or volunteers in whom research sequences are to be performed (ie, MR scan sequences that have not yet been approved by the FDA) should also have hearing protective devices in place prior to initiating any MR sequences. Without hearing protection in place, MRI sequences that are not FDA-approved should not be performed on patients or volunteers.

DESIGN DEFECT
26. Defendant failed to exercise reasonable care under the circumstances in designing the headphones for use in MRI scanners as 14 decibels sound attenuation is not 30 decibels protection. A reasonable person could have foreseen that the headphones did not provide sufficient protection. 14 decibels protection level headphones are not enough protection to use in 3 Tesla magnetic field strength scanners capable of creating noise in excess of 130 decibels.

27. Defendant's product labeling failed to provide any warning or instruction on the headphones, that they by themselves, do not provide sufficient protection to use in 3 Tesla magnetic field intensity MRI scanners, which a manufacturer or distributor exercising reasonable care would have provided, concerning hearing protection in a 3 Tesla MRI scanner.

28. The hearing risk of the headphones was not open and obvious, or of a type that is matter of common knowledge.

5

29. I had no reason to expect that the headphones did not provide sufficient hearing protection in the MRI scanner as I thought that IU Health Simon Cancer Center was following safety rules.

30. A reasonable person would expect to use the headphones as protection from the high noise levels in an MRI scanner. They would not expect that the headphones could not provide sufficient protection as they are specifically designed for use inside an MRI scanner as there is no metal in the headphones. These headphones have a design defect in that they do not provide enough decibels of hearing protection to protect a patient in a Siemens Magnetom Skyrafit 3 Tesla magnetic field strength scanner.

31. The headphones did not have any warnings on them that they had to have earplugs worn under them to provide sufficient sound reduction to provide a 30 decibel sound reduction. Without a warning a I assumed the headphones provided hearing protection sufficient to protect a me undergoing an MRI exam. This failure to warn resulted in noise induced permanent hearing damage to me.

32. Defendant designed and manufactured the headphones. One of the alleged design defects is the plastic tube that enters each side of the headphones and goes to the MRI control booth where the technicians sit. This tube lets the technicians play music and talk to the patient during the exam with the sound conducted through the inside of the plastic tubes and going inside the headphones. These plastic tubes are not found on other hearing protection headphones which typically have a 30 decibel protection factor. The plastic tubes are one alleged reason for the low decibels of protection the headphones provide because MRI scanner noise can penetrate the walls of the plastic tubes and go inside the headphones.

33. The plastic tubes reduce the headphones protective decibels.  Sound from the scanner is conducted through the walls of the plastic tubes and goes into the inside of the plastic tubes which go into the headphones. This decreases the protective decibel reduction of the headphones This is a safety hazard as it is not essential to play music for the patient or talk to the patient during an MRI exam.

ACOUSTIC IMPEDANCE
34. When sound travels from one medium into another there is a decibel loss because the acoustic impedance of the 2 mediums is not the same and there is an impedance mismatch. So most of the sound is reflected or absorbed rather than transmitted across the interface between the two mediums. The impedance of a material is related to its density multiplied by the speed of sound in the material. So for example, if you get water inside your ear canal sound transmission is reduced because of the impedance mismatch between the outside air and the water in your ear canal. As another example inside a car you cannot hear an ambulance siren as easily when the windows are rolled up as when they are rolled down. This is because there is an impedance mismatch between the car windows and the air which reduces the transmission of sound. One problem with the defendant's design is they could have had the tube they play music through inside a bigger outer tube with a cloth spacer between the inner and outer tubes so they do not touch each other. This would cause sound from the MRI going through

6

the tube walls to be reduced much more than having one tube only. By having a larger tube containing the smaller tube there would have been more impedance mismatches between the outer and inner tubes and less sound would have been transmitted from the MRI scanner through the sides of the plastic tubes leading into the headphones. This is analogous to using double glazed windows ( two panes of glass instead of one) in windows to reduce sound transmission through a window. However the defendant's engineers did not do that. So they have to have earplugs used inside the headphones to get a 30 decibels sound reduction.

35. An example of the attenuation of sound is the following: Sound in air that strikes a water surface is transmitted into the water according to the following formula.
Acoustic impedance of air= 408 pascals/meter^2
Acoustic impedance of water= 1500000 pascals/meter^2
The sound transmission coefficient= 2*408/(408+1500000)=0.000544 of the sound is transmitted from air into water.
To calculate the decibels of sound reduction that the sound going from air to water causes, the formula is:
10*log [(2*408)/(408+1500000)] = -32.64 decibels of sound reduction to sound crossing from air into water. So water filling up  your ear canal can give you 32.64 decibels of sound reduction.

## 36 . Manufacturer

Ind. Code § 34-6-2-77. (a) "Manufacturer," for purposes of IC 34-20, means a person or an entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product before the sale of the product to a user or consumer. "Manufacturer" includes a seller who:

1. has actual knowledge of a defect in a product;
2. creates and furnishes a manufacturer with specifications relevant to the alleged defect for producing the product or who otherwise exercises some significant control over all or a portion of the manufacturing process;
3. alters or modifies the product in any significant manner after the product comes into the seller's possession and before it is sold to the ultimate user or consumer;
4. is owned in whole or significant part by the manufacturer; or
5. owns in whole or significant part the manufacturer.

(b)  A seller who discloses the name of the actual manufacturer of a product is not a manufacturer under this section merely because the seller places or has placed a private label on a product.

37. Siemens AG owns a significant part Siemens Medical Solutions, USA. Siemens AG owns a significant part Siemens Healthineers AG.

38. Siemens Medical Solutions, USA was the manufacturer of the headphones, and they sold them to IU Health Simon Cancer center.

39. Alternatively if the headphones were manufactured by Siemens AG or their owned in significant part subsidiary Siemens Healthineers AG, this makes Siemens Medical Solutions USA the manufacturer per IC 34-6-2-77 for strict liability.

40. Alternatively Siemens Medical Solutions, USA furnished the design specifications to a manufacturer of the headphones to use the plastic tubes connecting the headphones to the MRI control booth, which is one alleged defect in the design. The headphone's design specifications did not have a warning that the headphones need to have earplugs worn under them to meet the FDA requirement that no more than 99 decibels should be heard by a patient with the hearing protection in place.

41. The exact design, and manufacturing of the headphones cannot be determined until discovery has been completed. This complaint states that Siemens Medical Solutions, USA manufactured and designed the headphones, branded them as Siemens Medical Solutions, USA headphones. Due to the large number of all the worldwide Siemen's subsidiaries there may be a co manufacturer that used the defendant's design and engineering specifications to manufacture the headphones and branded them as defendant's headphones.

LEARNED INTERMEDIARY
42. Indiana University Health Siemens Cancer Center MRI technicians did not know that the defendant's headphones were not sufficient to provide sound reduction to protect patients inside a 3 tesla MRI scanner.

43. The FDA requires hearing protection for patients undergoing a MRI exam such that the sound at the ear of the patient does not exceed 99 decibels with the hearing protection in place. A 3 Tesla magnetic field strength scanner can put out over 130 decibels sound so 14 decibels protection does not provide 99 or less decibels at the patient's ear. 130 decibels inside the scanner minus 14 decibels protection = 116 decibels sound level at the ear drum of a patient.

44. There was no warning on the Siemen's headphones that stated they had to be used in combination with earplugs to get a 30 decibel sound reduction. There was information on the headphones such as the model number etc. but no information on the decibels of protection offered by the headphones.

45. Michael Batta, an Indiana University Health Simon Cancer Center MRI manager, stated on June 19, 2023 to me during an in person conversation inside the Simon Cancer Center MRI area that they normally do not use earplugs under the headphones.

46. On another day after my exam Donna, an MRI technician at Indiana University Health Simon Cancer Center, showed the headphones to me inside the Simon Cancer Center and stated they normally do not use earplugs under the headphones.

47. Subsequent to the June 24, 2021 MRI exam I bought my own pair of MRI safe headphones at the Earplug Superstore with a 30 decibel sound reduction for $39.95 plus tax and shipping charges so adequate MRI headphones are inexpensive. Defendant's headphones were listed at $582 in December 2023.

48.The design defect along with the failure to put a written warning on the headphones to use earplugs under them was enough that the MRI technicians did not, as a standard practice, give patients earplugs to wear under the headphones. If I had earplugs worn under the headphones there would be sufficient decibel protection to avoid my hearing injury. The attached  UCLA Brain imaging document (pages 14,15, and 16 of the pleading) warns that earplugs must be worn under the Siemen's headphones.

DISCOVERY
49. Siemens Medical Solutions USA has objected to all of my discovery questions in their reply. Because of this I do not have all of the facts to plead at this time. By obfuscating discovery defendant has prevented me from providing sufficient facts such as getting the hearing protection technical data for the Siemens Magnetom Skyrafit 3 Tesla MRI scanner to state exactly how many decibels of hearing protection is required for that scanner. This technical data is only available to a registered owner of the machine or through discovery. This impairs my ability to state a claim. For this reason a 100% perfect pleading cannot be made at this time. We are dealing with a complex MRI machine and headphones designed to be used inside it. It is not reasonable to expect me to have every fact sufficient to 100% perfectly plead a claim until discovery has been conducted. Defendant's discovery reply is attached to this pleading to support the allegation that they have obfuscated discovery.

**CAUSES OF ACTION**
50.The following is a non-exhaustive list of causes of action supported by the facts of this case. Rabe v. United Air Lines, Inc., 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."); Ryan v. Ill. Dep't of Children & Family Servs., 185 F.3d 751, 764 (7th Cir. 1999) ("We have consistently held that plaintiffs are not required to plead legal theories. While a plaintiff may plead facts that show she has no claim, she cannot plead herself out of court by citing to the wrong legal theory or failing to cite any theory at all." (citations omitted)). These enumerated causes of action shall not in any way limit the legal bases for liability or recovery in this case.

51. There are facts that can only be determined during discovery and which preclude 100% exact statement at the pleading stage. For example the definition of a manufacturer is relevant to whether strict liability can be used in this case. The determination of whether Siemens Medical Solutions USA is a manufacturer is a question of fact and law. A jury needs to weigh the design specifications, whether Siemens Medical Solutions USA was aware of the low 14 decibels of hearing protection of the headphones, whether they had manufacturing control, and the substantial ownership of Siemens Medical Solutions USA by Siemens AG if the headphones were made in Germany by Siemens AG or a Siemens AG subsidiary. This requires discovery,

9

and a jury to determine if the defendant is defined as a manufacturer per IC 34-6-2-77 so as to have strict liability in this case.

52. Indiana is a notice pleading state and requires that pleadings contain only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"Ind. Trial Rule 8(A)(1). Plaintiffs need not "set out in precise detail the facts upon which the claim is based, [but they] must still plead the operative facts necessary to set forth an actionable claim." Trail v. Boys & Girls Club of Nw. Indiana, 845 N.E.2d 130, 135 (Ind. 2006). This means that although "highly desirable," a precise legal theory in a pleading—a principle connecting a claim to the relief sought—"is not required."

53. Indiana is "a notice-pleading state, ... requir[ing] that pleadings 'contain a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for relief.' " KS & E Sports , 72 N.E.3d at 901 (alteration in original) (quoting Ind. Trial Rule 8(A) ). This "liberal" standard "merely requires that a 'complaint ... put the defendant on notice concerning why it is potentially liable and what it stands to lose.' " Id. (alteration in original) (quoting Noblesville Redev. Comm'n , 674 N.E.2d at 564 ).

54. In a federal §1983 case Johnson v City of Shelby the US supreme court said: This opinion will impact claims being filed against public agencies by members of the general public — especially those doing so without counsel — in that the legal threshold for their lawsuit to survive is lowered. While plaintiffs must plead facts sufficient to show that their claim has substantive plausibility under *Twombly* and *Iqbal*, there is no requirement that the legal theory be as clearly stated, and the Court held that the lower courts should have given plaintiffs an opportunity to amend their complaint to mention §1983. The Court affirmed the position that it is unnecessary to set out a legal theory for the plaintiff's claim to survive a motion to dismiss.

**Count 1 Indiana Products Liability Act 34-20-2-1**
55.I incorporate by reference all allegations of this Complaint as if fully set forth herein.

56. When the headphones left the possession of defendant they were defective and unreasonably dangerous for their intended and foreseeable use, including but not limited to not providing enough decibels of sound reduction to protect patients undergoing MRI scans in 3 Testa magnetic field strength MRI scanners which includes the Siemen's Magnetom Skyrafit 3 Tesla scanner which was used on me.

57.I was in the class of persons that defendant should have reasonably foreseen as being subject to the harm caused by the defective condition of the headphones that I used on June 24, 2021 during the MRI scan.The defective condition was the low 14

decibels of sound reduction and no warning on the headphones that earplugs must be used under them.

58. Defendant was engaged in the business of selling the headphones and put them into the stream of commerce selling them to Indiana University Health Simon Cancer Center.

59. The headphones were expected to and did reach me without substantial alteration in the condition to which they were sold by the defendant.

60. The defendant had a duty to place a warning on the headphones that they did not provide sufficient hearing protection unless earplugs are worn under the headphones.

61. The defendant did not place a warning on the headphones. A warning sticker placed on the headphones is an inexpensive thing to do.

62. I was injured by the defective headphones on June 24, 2021 because they did not provide sufficient hearing protection. The defective headphones are the proximate cause of my hearing injury.

63. The danger to my hearing by using the headphones was not open and obvious to me or a learned intermediary such as the MRI technicians at the Indiana University Health Simon Cancer Center.

64. The headphones did not have to use plastic tubes so music can be played or the MRI technicians can talk to the patient. Mayo Clinic did not have plastic tubes on my headphones in the two 1.5 tesla MRIs and the two 3 tesla MRIs I had after the June 24, 2021 exam at IU Simon Cancer Center.

65. The headphones did not have a design to reduce the transmission of MRI noise through the walls of the plastic tubes going into the headphones, and they only provide 14 decibels of sound reduction which is not enough for 3 tesla MRI scanners which can reach 130.7 decibels sound level which can damage hearing.

66. There are alternative ways to improve the headphones so that they have more decibels of protection than the 14 decibels of protection the defendant's headphones have such as the tube inside a tube design as previously stated, or to not use tubes on the headphones, as was the case at Mayo Clinic.

67. The learned intermediary MRI technicians at IU Simon Cancer Center did not know the headphones did not provide sufficient sound attenuation.

68. As a direct and proximate result of defendant placing the headphones into the stream of commerce, I suffered permanent hearing damage as the 14 decibels of protection was not sufficient.

11

**Count 2 Strict Product Liability in Tort Indiana Products Liability Act 34-20-2-1**
69.I incorporate by reference all allegations of this Complaint as if fully set forth herein.

70. Siemens Medical Solutions USA manufactured the headphones.

71.Siemens Medical solutions USA is a manufacturer per IC 34-6-2-77.
Siemens Medical Solutions USA is owned in a significant part by Siemens AG a German company located in Munich Germany. Per IC 34-6-2-77 if the headphones were made in Germany by Siemens AG, Siemens Medical Solutions USA is legally the manufacturer for strict liability per IC 34-6-2-77 because it is owned in a significant part by Siemens AG.

72.Indiana 34-6-2-77 defines what a manufacturer is for the Indiana products law. It says controlling the design of a safety defect makes defendant the manufacturer. Defendant controlled the technical specifications of the headphones. Defendant controlled the design of the headphones resulting in a 14 decibel sound reduction. If the headphones were made by some other manufacturer, defendant is still the manufacturer because they furnished the manufacturer with the design specifications for the headphones which resulted in the 14 decibel sound reduction which is a design defect. Also the lack of a warning on the headphones is a design defect. Whether the defendant is a manufacturer is a question of fact and law and needs a jury to make the determination if the defendant manufactured the headphones.

73. When the headphones left the possession of defendant they were defective and unreasonably dangerous for their intended and foreseeable use, including but not limited to not providing enough decibels of sound reduction to protect patients undergoing MRI scans in 3 Testa magnetic field strength MRI scanners which includes the Siemen's Magnetom Skyrafit 3 Tesla scanner which was used on me.

74.I was in the class of persons that defendant should have reasonably foreseen as being subject to the harm caused by the defective condition of the headphones that I used on June 24, 2021 during the MRI scan. The defective condition was the low 14 decibels of sound reduction and no warning on the headphones that earplugs must be used under them.

75. Defendant was engaged in the business of selling the headphones and put them into the stream of commerce selling them to Indiana University Health Simon Cancer Center.

76. The headphones were expected to and did reach me without substantial alteration in the condition to which they were sold by the defendant.

77.The defendant had a duty to place a warning on the headphones that they did not provide sufficient hearing protection unless earplugs are worn under the headphones.

78. The defendant did not place a warning on the headphones. A warning sticker placed on the headphones is an inexpensive thing to do.

79. There was no warning on the headphones that they needed earplugs underneath them in order to have a 30 decibels of protection to limit my noise exposure to 99 decibels or less with the hearing protection in place.

80. I was injured by the defective headphones on June 24, 2021 because they did not provide sufficient hearing protection. The defective headphones are the proximate cause of my hearing injury.

81. The danger to my hearing by using the headphones was not open and obvious to me or a learned intermediary such as the MRI technicians at the Indiana University Health Simon Cancer Center.

82. The headphones did not have to use plastic tubes so music can be played or the MRI technicians can talk to the patient. Mayo Clinic did not have plastic tubes on my headphones in the two 1.5 tesla MRIs and the two 3 tesla MRIs I had after the June 24, 2021 exam at IU Simon Cancer Center.

83. The headphones did not have a design to reduce the transmission of MRI noise through the walls of the plastic tubes going into the headphones, and they only provide 14 decibels of sound reduction which is not enough for 3 tesla MRI scanners which can reach 130.7 decibels sound level which can damage hearing.

84. There are alternative ways to improve the headphones so that they have more decibels of protection than the 14 decibels of protection the defendant's headphones have such as the tube inside a tube design as previously stated, or to not use tubes on the headphones, as was the case at Mayo Clinic.

85. The learned intermediary MRI technicians at IU Simon Cancer Center did not know the headphones did not provide sufficient sound attenuation.

86. As a direct and proximate result of defendant placing the headphones into the stream of commerce, I suffered permanent hearing damage as the 14 decibels of protection was not sufficient.

87. The danger to my hearing by using the headphones was not open and obvious to me or a learned intermediary such as the MRI technicians at the Indiana University Health Simon Cancer Center.

88. The headphones did not have to use plastic tubes so music can be played or the MRI technicians can talk to the patient. Mayo Clinic did not have plastic tubes on my headphones in the two 1.5 tesla MRIs and the two 3 tesla MRIs I had after the June 24, 2021 exam at IU Simon Cancer Center.

13

**Count 3 Negligent Failure to Warn 34-20-4-2**

89.I incorporate by reference all allegations of this Complaint as if fully set forth herein.

90. There was no warning sticker or printing on the headphones that they needed earplugs underneath them in order to have 30 decibels of protection to be used inside a 3 tesla magnetic field MRI scanner. The headphones had the model number etc. printed on them but did not state they provide only 14 decibels of protection and that they needed to have earplugs used under them to meet the 99 decibels maximum sound level with hearing protection in place that is the FDA regulation.

91. The MRI technicians  at IU Health Simon Cancer Center were unaware that the headphones, by themselves, do not provide sufficient hearing protection during scans in their Siemens Magnetom Skyrafit 3 tesla magnetic field intensity scanners.

92. Because the  MRI technicians at IU health Simon Cancer Center did not know about the need to use earplugs under the headphones they did not meet the standard of sophisticated intermediaries to protect the patients with earplugs under the headphones, so a warning should have been on the headphones to use earplugs under the headphones along with the model number etc. that is on the headphones.
There is a warning on page 77 of the Siemens Skyra scanner ( a similar loudness 3 tesla MRI) that 30 decibels of hearing protection has to be used in the Siemens Skyra scanner.

93. IU Simon Cancer Center does not typically use earplugs under the headphones as a matter of policy, as stated by Donna and Michael Batta. There should have been warnings on the headphones that earplugs must be used under these headphones to achieve 30 decibels of hearing protection.

94.The headphones were used on me without substantial alteration in their condition.

95. As a direct and proximate result of defendant placing the headphones into the stream of commerce, I suffered permanent hearing damage as the 14 decibels of protection was not sufficient.


**DAMAGES**
96.I incorporate by reference all allegations of this Complaint as if fully set forth herein.

97. As a direct and proximate result of the defective design of the headphones and negligence of Defendants, I have suffered damages including serious personal injury and illness, pain and suffering, past and future medical costs and expenses, past and future medical monitoring, loss of past and future income, impaired earning capacity, inconvenience, and loss of enjoyment, and quality of life.

98. Wherefore, I pray for judgement against defendant in an amount that will compensate me for all damages sustained, for costs, losses, expenses, pre-judgement interest and damages recoverable under Indiana Law, and for all other just and proper relief.

Request for jury trial
I respectfully request that this matter be set for trial by jury.
Respectfully submitted, *james wertz*
James Wertz
PO BOX 365
Indianapolis In 46206
js4842648@gmail.com

Certificate of Service
This document was mailed to
 on January 8, 2024

Frost Brown Todd LLP
111 Monument Circle, Suite 4500
 PO Box 44961
 Indianapolis, IN 46244-0961

15

# SIEMENS

## System Owner Manual

## MAGNETOM
## Skyra

© Siemens AG 2010–2012
All rights reserved

Siemens AG
Wittelsbacherplatz 2
80333 Muenchen
Germany

**Contact Information:**
Siemens AG
Healthcare Sector
Magnetic Resonance
Henkestrasse 127
91052 Erlangen
Germany

Telephone: +49 9131 84-0
www.siemens.com/healthcare

Print No. M7-03002.629.06.03.24

AG 11/12



16

**7**

## Hearing protection data

The A-evaluated, effective sound pressure level was measured according to NEMA MS 4-2006 (National Electrical Manufacturers Association) using the maximum gradient acoustic noise (MGAN) method.

| Patient noise | |
|---|---|
| XQ gradients | Patients require hearing protection with an SNR[1] = 30 dB or more |

1. SNR = Single Number Rating

| Noise for personnel in the examination room | |
|---|---|
| XQ gradients | Noise measured: 88.3 dB(A) |
| | Hearing protection: SNR = 7 dB or more |

*17*

Updated: January 10, 2022

# MRI Laboratory
# Safety Manual



**UCLA**
Brain Mapping Center

## Ahmanson-Lovelace Brain Mapping Center
## University of California, Los Angeles

1

/8

*The following categories of human participants with tattoos must always have a cold compress applied to the tattoo(s) during MRI scanning under the default policy:*

➢ Participants who have previously experienced tattoo related discomfort during MRI procedures but who do not meet the exclusion criteria above
➢ Participants who have experienced tattoo related discomfort during the current MRI procedure but who do not meet the exclusion criteria above
➢ Participants with neck tattoos
➢ Participants with large tattoos (> 20 cm length)

Please do not email photos of tattoos to BMC staff to inquire about their compliance with the default policies. Any ambiguities (e.g., "Does this tattoo extend onto the participant's face or not?") should automatically err on the side of the more restrictive, safer policy. Unlike medical implants, tattoos do not require prior approval by Dr. Woods. If your study has IRB approval for a tattoo policy that is less restrictive than the BMC default policy, please provide a courtesy notification to BMC technologists of this fact in advance when scheduling participants known to have tattoos that would be disqualifying under the default policy.

## Clothing During MRI Scanning

It is **required** that research participants be changed into BMC provided MR safe gown tops and pajama pants. Please note that underclothing may also pose a safety risk unless made entirely of cotton or linen, particularly if metallic fasteners are present. If underclothing is not cotton it will also need to be removed.

No athletic or workout underclothing can be worn during MRI scanning, including, but not limited to compression wear, sport underwear, sport bras, etc. Such items are increasingly manufactured with metallic antimicrobial components invisibly woven into the fabric, posing an unacceptable risk of avoidable burns.

Absolutely forbidden: 1) underclothing designated as "anti-microbial", "anti-odor", "heat-retaining" or otherwise indicating any special properties of the fabric; 2) underclothing made of any fabric marketed with a specific brand-name (i.e. zircon fabric)

The research team may elect to allow research subjects to wear underclothing not forbidden above during MR scanning, but should be aware that this potentially entails some risk that cannot necessarily be mitigated by looking at clothing labels, even if labelled as 100% cotton. PI's are responsible for determining how these risks should be managed and may wish to include these risks in consent and IRB materials. The BMC cannot endorse any particular underclothing product as MR safe and recommends following the ACR whitepaper guidelines (specifically pages 14 and 35) unless there is a compelling reason not to do so. Researchers should consider that each item of underclothing increases the potential risk and that brassieres are currently more likely than underpants to contain unsafe materials.

## Ear Plugs and Headphones

Anyone in the scanner room while the scanner is in operation must be provided with and must use hearing protection in the form of earplugs and/or headphones to avoid hearing injury from

*19*

the acoustic noise generated by the scanner. According to the Prisma documentation, if you are using the Siemens headphones you MUST also provide the participant with earplugs for additional hearing protection. The FDA requires 30 dB or greater for hearing protection and the Siemens headphones alone only provide 13 dB. However, the Resonance Technology headphones are sufficient to use alone without earplugs.

## Automated External Defibrillator (AED)

**An automated external defibrillator (AED) is located in a white cabinet the imaging wing hallway near the back exit to the building just adjacent to the MRI suite.** The AED and associated equipment are not MR safe and should NEVER be brought into an MR scan room. **A participant in need of resuscitation must be removed from the scan room using the MR compatible gurney before AED equipment and supplies can be safely used.**

## Medical Gases

**Both scan rooms are equipped with compressed air and suction from tubes that hang from the ceiling.** Medical oxygen is not available in the scan room. **An oxygen tank is located in the TMS Lab, room 159.** The oxygen tank is NOT MR compatible.

## ECG, Pulse and Respiratory Monitoring

The scanner is equipped with leads and devices that can be used for ECG, pulse or respiratory monitoring. These are primarily intended for acquisition of gated scan images but can also be used for monitoring purposes. Only specially designed electrodes can be safely used for monitoring and must be used in strict accordance with the manufacturer's guidelines. If you need to perform physiologic monitoring, you must first obtain special training on the proper use of the monitoring equipment. Note that the magnetic field alters the contours of the electrocardiogram.

**If a patient requires the use of a defibrillator (defibrillation should NEVER be performed in the scanner room), monitoring electrodes applied for use in the scanner should be removed first to avoid electrical burns.**

## MR Compatible Gurney

An MR compatible gurney is available in the MR suite. The gurney is a vital piece of safety equipment and **should not be removed from the MR suite under any circumstances** other than for evacuation of a non-ambulatory person from the building in the event of a fire or earthquake. The MR compatible gurney should not be taken to the hospital to pick up or deliver a patient. Such patients should be brought to the ALBMC using standard transport equipment and transferred to the MR compatible gurney in the ALBMC. An MR compatible wheelchair is also available and no other gurney or wheelchair should ever be brought into either of the scanner rooms. The MR compatible gurney should be stored in the Prisma (3 Tesla) scanner room when not in use. The MR compatible wheelchair is stored in the Prisma (3 Tesla) scanner room.

The MR compatible gurney has a weight limit of 400 pounds, so no participant (even if ambulatory) weighing more than 400 pounds should enter the scanner room. For a 200-pound person, a minimum of two people are typically required to transfer a person on or off the gurney.

10

ZO



| AUTHOR: | SBOGAERT | PAGE: | 1/115 |
|---------|----------|-------|-------|
| DATE: | 2019-10-25 | VERSION: | 1 |
| TITLE: | MRI USER MANUAL SIEMENS PRISMA | | |

# GIfMI MRI user manual SIEMENS PRISMA

Stephanie Bogaert, MSc
Pieter Vandemaele, MSc
Pim Pullens, PhD
© Ghent Institute for functional and Metabolic Imaging
April 2019

## OVERVIEW

I.   Introduction ...................................................................................................................5
   Note to the reader ...........................................................................................................5
   Contact .............................................................................................................................5
   Important phone numbers................................................................................................5
II.   GIfMI scanning policy – MRI safety...............................................................................6
   Policy regarding personnel - requirements .....................................................................6
   Access conditions.............................................................................................................6
   Policy regarding pregnancy..............................................................................................6
   Policy regarding obese participants.................................................................................7
   Policy regarding children..................................................................................................7
   Policy regarding patient populations...............................................................................7
III.   Emergency procedure ..................................................................................................8
   Main hazards....................................................................................................................8
   Reporting of safety incidents or near-incidents ..............................................................8
   Medical crash cart, medical gases and AED .....................................................................8
   Use of the MR compatible stretcher................................................................................8
   Performing an emergency magnet quench: Magnet Stop switch .....................................9
      Situations requiring a Magnet Stop: ............................................................................9
      Quench procedure .......................................................................................................9
   Performing a table stop ..................................................................................................10
      Table stop procedure..................................................................................................10
   Fire safety.......................................................................................................................12
IV.   THE GIFMI FACILITY....................................................................................................13
   MRI Control room ..........................................................................................................13
   MRI scanner room ..........................................................................................................14
      Equipment in the MRI scanner room..........................................................................15

21

## Inside the scanner room: squeeze ball (participant's alarm) and Siemens ear phones

The scanner is equipped with a squeeze ball that allows the participant to set off an audible alarm to attract the operator's attention. Making the squeeze ball available to participants is mandatory during the entire protocol. Show the participant how to activate the alert by pressing the squeeze bulb.

The participant can use the earphones to listen to announcements or music during the measurement. The use of earphones has to be combined with the use of earplugs!

The squeeze ball (red) and earphones (yellow) are connected at the foot end of the bed. Check the connection.



Responding to a squeeze ball alarm

- If the participant alert is activated, a continuous audible alarm is emitted via the intercom and the alarm button LED lights up.



- If a scan is ongoing, stop the sequence.
- Press the alarm button (4) to deactivate the alert, ask the participant why he/she requests to stop the scan (1) and listen to the participant (2). Make sure that the volume is turned up so that you can hear the subject's response. If necessary, enter the room to further investigate and correct the problem.



22

**STATE OF INDIANA**
**IN THE MARION SUPERIOR COURT NO. 3**

| | | |
|---|---|---|
| JAMES WERTZ, | ) | CAUSE NO. 49D03-2306-CT-025152 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIEMENS MEDICAL SOLUTIONS USA, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## SIEMENS MEDICAL SOLUTIONS USA, INC.'S ANSWER TO PLAINTIFF'S INTERROGATORIES AND REQUEST FOR PRODUCTION

Defendant Siemens Medical Solutions USA, Inc. ("Siemens), by counsel, and for its answer to Plaintiff's Interrogatories and Request for Production:

### PRELIMINARY STATEMENT

Each of Siemens' responses and objections to Plaintiff's Interrogatories and Request for Production incorporates this Preliminary Statement, which is set forth here and in this manner to avoid duplication by repeating it within each response. While the Preliminary Statement may be referred to specifically within a response to a particular interrogatory, the failure to do so is not, and should not be construed as, a waiver thereof.

While Plaintiff has not provided what health care facility Plaintiff received an MRI scan at on June 24, 2021, it is the responsibility of the health care facility to ensure that the Skyra Fit and the hearing protection is used properly.

Siemens has not yet completed its investigation of the facts related to this litigation. The responses contained herein are based only upon such information and documentation that is presently available to Siemens and disclose only those contentions that presently occur to Siemens. It is anticipated that further investigation, research, and analysis may supply additional facts and

1

documents, add meaning to known facts, and perhaps establish entirely new factual conclusions, all of which may in turn lead to substantial additions or changes to these responses. Accordingly, Siemens reserves the right to supplement and/or amend these responses, and to offer related evidence, as additional facts are ascertained, analysis is made, research is completed, and contentions become apparent. In addition, Siemens will fulfill its obligation to supplement these responses pursuant to the applicable rules, if necessary.

**INTERROGATORIES**

**INTERROGATORY NO. 1:** Regarding safety in the operation of the Siemens Skyra Fit 3 Tesla MRI scanner, please state:

a.      Is the excerpt from the "Magnetom Family Operator Manual — MR System syngo MRE11, pages 30-31, attached hereto and incorporated herein as Exhibit 1, information that is provided by Siemens to health care facilities who purchase/operate the Siemens Skyra Fit 3 Tesla MRI scanner the plaintiff allegedly used for his MRI scan on June 24, 2021?

b.      Did Siemens provide the *"System Owner Manual, Technical data: Hearing protection data"* (referred to on page 30 of Exhibit 1) to health care facilities who purchase/operate the Siemens Skyra Fit 3 Tesla MRI scanner the plaintiff allegedly used for his MRI scan on June 24, 2021?

c.      What is the maximum noise development in dB(A) of the Siemens Skyra Fit 3 Tesla MRI scanner the plaintiff allegedly used for his MRI scan on June 24, 2021?

d.      Please describe what constitutes "appropriate hearing protection that lowers noise to at least 99dB(A)" as described on page 30 of Exhibit 1.

e.      Please describe the nature and severity of "hearing impairment" that Siemens was aware of on and before June 24, 2021, in patients undergoing MRI in the Siemens Skyra Fit 3 Tesla MRI

2

scanner in the absence of "appropriate hearing protection" as that term is used on page 30 of Exhibit 1.

f.        The first bullet point on Page 31 of Exhibit 1 includes the following language: "For appropriate sound attenuation, the proper use of hearing protection is important. All personnel should be trained to correctly apply the hearing protection." Regarding this bullet point, please specifically describe how the to achieve:

a.        Appropriate sound attenuation,

b.        Proper use of hearing protection,

c.        Training all personnel to correctly apply hearing protection.

**ANSWER:** Siemens objects to this interrogatory as compound.

a.        Siemens objects to subpart (a) of this interrogatory on the grounds it is vague, overly broad, unduly burdensome and not reasonably limited in scope because it seeks information about health care facilities that are not at issue in this litigation. Accordingly, information sought by subpart (a) of this interrogatory is neither relevant nor proportional to the needs of this case.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

b.        Siemens objects to subpart (b) of this interrogatory on the grounds it is vague, overly broad, unduly burdensome and not reasonably limited in scope because it seeks information about health care facilities that are not at issue in this litigation. Accordingly, information sought by subpart (b) of this interrogatory is neither relevant nor proportional to the needs of this case.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

3

c.      Siemens objects to subpart (c) of this interrogatory on the grounds that it requests expert information. It is the responsibility of the parties to retain their own experts regarding causation and damages.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

d.      Siemens objects to subpart (d) of this interrogatory on the grounds that it requests expert information. It is the responsibility of the parties to retain their own experts regarding causation and damages.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

e.      Siemens objects to subpart (e) of this interrogatory on the grounds that it is overly broad and unduly burdensome and seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens further objects to subpart (e) as vague and ambiguous through the use of the undefined phrases "nature and severity" and "hearing impairment."

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

f.      Siemens objects that this request is overly broad and unduly burdensome and seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens objects to subpart (f) of this interrogatory on the grounds that it seeks information that is duplicative of information that is contained in documents that are already produced or requested to be produced.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

**INTERROGATORY NO. 2:**  Regarding the first bullet point on Page 31 of Exhibit 1, "For appropriate sound attenuation, the proper use of hearing protection is important. All personnel should be trained to correctly apply the hearing protection." Please state:

a.       What is meant by the term: "all personnel."

b.       Who is expected to train "all personnel."

c.       Did Siemens recommend any specific training?

d.       Describe the training Siemens recommended.

**ANSWER:** Siemens objects that this request is overly broad and unduly burdensome and seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens also objects to this interrogatory as compound. Siemens further objects to this interrogatory on the grounds that it seeks information that is duplicative of information that is contained in documents that are already produced or requested to be produced.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:** Please provide the complete System Owner Manual for the Siemens Skyra Fit 3 Tesla MRI scanner allegedly used by plaintiff's healthcare providers on June 24, 2021.

**RESPONSE:** Siemens objects to this request as it purports to require Siemens to disclose privileged and/or other confidential, proprietary, and/or trade secret documents and information without the entry of a protective order.

5

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

**REQUEST NO. 2:** Please provide a copy of the "System Owner Manual, Technical Data: hearing protection data" referred to on page 30 of Exhibit 1.

**RESPONSE:** Siemens objects to this request as it purports to require Siemens to disclose privileged and/or other confidential, proprietary, and/or trade secret documents and information without the entry of a protective order.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

**REQUEST NO. 3:** Please produce a copy of any correspondence between Siemens and IU Health from on and before June 24, 2021, regarding hearing protection for patients undergoing MRI in the Siemens Skyra Fit 3 Tesla MRI scanner.

**RESPONSE:** Siemens objects to this request on the grounds it is vague, overly broad, unduly burdensome, not reasonably limited in scope, seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens further objects to this request as it purports to require Siemens to disclose privileged and/or other confidential, proprietary, and/or trade secret documents and information without the entry of a protective order.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

**REQUEST NO. 4:** Please produce a copy of the owner's manual for the Siemens Medical Solutions headphones that Siemens provided for use with the Siemens Skyra Fit 3 Tesla MRI scanner in operation on June 24, 2021.

**RESPONSE:** Siemens objects to this request on the grounds it is vague, overly broad, unduly burdensome, not reasonably limited in scope, seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens objects to this request as it purports to require Siemens to disclose privileged and/or other confidential, proprietary, and/or trade secret documents and information without the entry of a protective order.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

**REQUEST NO. 5:** Please produce a copy of the owner's manual/product information for the ear plugs offering sufficient hearing protection in the Siemens Accessories catalog referred to in Exhibit 1, p.30.

**RESPONSE:** Siemens objects to this request on the grounds it is vague, overly broad, unduly burdensome, not reasonably limited in scope, seeks information that is not relevant to any party's claims or defenses, and is not proportional to the needs of the case. Siemens objects to this request as it purports to require Siemens to disclose privileged and/or other confidential, proprietary, and/or trade secret documents and information without the entry of a protective order.

Subject to and without waiving these objections, and upon entry of a Confidentiality Agreement, discovery continues.

Respectfully submitted,

FROST BROWN TODD LLP

By:  */s/ Kevin C. Schiferl*
     Kevin C. Schiferl, #14138-49
     Stephanie V. McGowan, #30759-49
     *Attorneys for Defendant Siemens Medical*
     *Solutions USA, Inc.*

7

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2023, a copy of the foregoing was served via email to the following:

James Wertz
PO Box 365
Indianapolis, IN  46206
js4842648@gmail.com
*Pro Se*

/s/ Kevin C. Schiferl

FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
PO Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
kschiferl@fbtlaw.com
smcgowan@fbtlaw.com

0154682.0774907  4866-1932-1218v1

8